Opinion issued February 13, 2014



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-13-00017-CV**

———————————

**NIGEL WILLIAMS, Appellant**

**V.**

**LORENA NICOLE BOWLES, Appellee**

---

**On Appeal from the 280th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-71981**

---

**MEMORANDUM OPINION**

This is an appeal from a family violence protective order entered against appellant Nigel Williams. *See* TEX. FAM. CODE ANN. § 85.001 (Tex. 2008). Williams argues that the trial court abused its discretion by failing to enter a directed verdict because no evidence was presented to support either of the two

elements necessary for a protective order to issue: an occurrence of family violence and a likelihood of future family violence. We affirm.

## Background

Appellee Lorena Bowles petitioned the trial court for a protective order against Williams. Bowles first met Williams in February 2011, when he was her boss. The two dated for over one and a half years. Although they stopped dating in July 2012, they would "still see each other" and were "attempting to work out the relationship" in subsequent months.

On November 17, 2012, Bowles was sick and missed work. Williams sent her a barrage of text messages throughout the day, including profane and jealous messages when Bowles stopped responding to him.

Williams telephoned that night and said he said he was coming to her residence. Even though she told him he was unwelcome, he appeared at her door at 10:30 p.m., awakening her. When she opened the door, her dog bolted outside, and when she returned from chasing it, she found Williams in her room. He beckoned her to come and sit next to him, asked her to talk with him, and then tried to kiss her. In the face of her refusals, he attempted to force her to have sex with him. When she asked him to leave, he persisted, pulling her shirt down and putting himself on top of her. She described what happened once he was over her:

> So I tried to push him away and I—I just tried to push him and hit him
> and then we started fighting and then he hit me on—the first hit, he hit

2

me on my left cheek and then he pulled me out of the bed and then my phone started ringing so I was going to answer it and he took off with my phone from me and so I started fighting to get my phone back and then the next thing I know, I was on the ground. He pulled me on the ground and he started hitting me on the back of my head and I was facing the floor and I tried to move and then he hit me the front side of my lip and then—and he stopped whenever my neighbors started knocking on the door.

When neighbors came to the door, Williams stopped hitting her. When she opened the door, Williams "took off." The neighbors called the police, and when they arrived Bowles made a report of what had happened. Though Williams had left the area, he continued texting and calling Bowles. Contrary to her expressed wishes, he returned after midnight, when the police were gone, but was stopped by a security guard and arrested.

Bowles offered photographs of her injuries at the hearing. They showed bruising and swelling on her chin and inside her lip. She had a large bruise on her right arm and bruises behind her ear. In the weeks after the incident, she felt pain when she sneezed or opened her jaw.

As Bowles explained at the evidentiary hearing on her request for a protective order, this incident was not the first time that Williams had been violent with her. Earlier in November, he pushed her, prompting her to bite him. Williams then bit her multiple times, resulting in "very bad bruises" on her body.

At the time of the November 17 incident, Bowles was no longer working in the same department as Williams, and he was no longer supervising her work.

3

Nevertheless, he contacted her twice thereafter, having no work-related reason to do so.

An emergency protective order barring Williams from contact with Bowles was entered on November 28. A week before the hearing on December 17, Bowles found a new job in a different part of the Houston area.

After the presentation of evidence, Williams moved for a directed verdict, which was denied. Announcing its decision to issue a protective order, the trial court found that Williams had committed family violence against Bowles and was likely to do so in the future. This appeal followed.

**Analysis**

In three issues, Williams argues that the evidence was legally insufficient to support each of two statutory elements required for the issuance of a family-violence protective order: a past occurrence of family violence and a likelihood of future violence. Williams argues that there was no evidence to show that family violence had occurred or that it was likely to occur in the future. A claim that "no evidence" supports a trial court's decision is a challenge to the legal sufficiency of the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review." *City of Keller*, 168 S.W.3d at 823.

Evidence offered at a hearing is not legally sufficient in the following situations: "(1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; (4) the evidence establishes conclusively the opposite of the vital fact." *Id.* at 810. When applying these criteria, we assess the evidence in the light most favorable to the finding, indulging every reasonable inference in its favor. *Id.* at 822. The ultimate question is whether the trial evidence would enable fair and reasonable people to reach the verdict under review. *Id.* at 827.

Before issuing a family violence protective order, a trial court must find that (1) family violence has occurred and that (2) family violence is likely to occur in the future. TEX. FAM. CODE ANN. § 85.001(a) (West 2008). Family violence encompasses dating violence. *Id.* § 71.004. Dating violence is:

> [A]n act, other than a defensive measure to protect oneself, by an actor that:
>
> (1) is committed against a victim:
>
> (A) with whom the actor has or has had a dating relationship . . . and
>
> (2) is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the victim in fear of imminent physical harm, bodily injury, assault, or sexual assault.

*Id.* § 71.0021(a) (West Supp. 2013). A dating relationship is "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." *Id.* § 71.0021(b). Self-defensive measures do not constitute family violence. *Id.* §§ 71.0021(a), 71.004(1). On the other hand, physical contact is not required to prove that family violence has occurred. *Id.* § 71.0021(a)(2) (family violence includes "a threat that reasonably places the victim in fear of imminent physical harm, bodily injury, assault, or sexual assault").

## I.      Occurrence of family violence

Williams does not contest that a dating relationship existed between him and Bowles. Rather, he contends that there was no evidence of family violence for purposes of Family Code section 85.001(a)(1) because the record, including Bowles's own testimony, establishes that his acts of violence on the night of the incident were merely defensive measures, which are excluded from the definition of family violence. He states, "Appellee testified that she started the fight by hitting appellant."

We disagree with Williams's characterization of the record. Although Bowles testified, "So I tried to push him away and I—I just tried to push him and hit him and then we started fighting," her full testimony was that she "tried to push him and hit him" only after had he pulled down her shirt, refused her requests to leave, tried to have sex with her against her will, and put himself on top of her.

6

Williams also relies on his own testimony that his actions were defensive. In doing so, he asks us to view the evidence through the wrong prism. In conducting a legal sufficiency review of a trial court's decision, we are to view the evidence in the light most favorable to the trial court's finding and indulge every reasonable inference in its favor. *See City of Keller*, 168 S.W.3d at 822. If two witnesses contradict each other, as Bowles and Williams did, it is for the trial judge to decide whom to believe as she is the sole judge of the credibility of the witnesses. *See id.* at 819. As long as "reasonable human beings could do so," we must assume that the judge resolved conflicts in the testimony of Bowles and Williams in favor of the finding of family violence. *Id.*

Bowles testified that Williams, refusing her requests for him to leave, pulled down her shirt, tried to have sex with her, and put his weight on top of her. *See* TEX. FAM. CODE ANN. § 71.0021(a) (defining dating violence to include acts intended to result in sexual assault). It was only then that Bowles pushed and hit Williams. He responded by beating her with his fists. *See id.* Bowles's testimony was more than a scintilla of evidence and legally sufficient to prove that family violence occurred. *See City of Keller*, 168 S.W.3d at 810.

## II. Likelihood of future violence

Williams also argues that there was no evidence that family violence was likely to occur in the future. In support of this argument, Williams relies upon

7

undisputed evidence that he and Bowles do not live together, they have no children together, and they do not work at the same place or close to one another.

While these facts are not disputed, we nevertheless cannot agree that they are dispositive of the appeal. The availability of a family violence protective order is not contingent upon a couple cohabitating or having children. *See* TEX. FAM. CODE. ANN. § 71.0021(b). The fact that the two no longer share the same employer likewise does not preclude the protective order.

Williams also argues that the evidence is legally insufficient to support the protective order, relying upon *Banargent v. Brent*, No. 14–05–00574–CV, 2006 WL 462268 (Tex. App.—Houston [14th Dist.] Feb. 28, 2006, no pet.) (mem. op.), *In re J.A.T.*, No. 13–04–00477–CV, 2005 WL 1981497 (Tex. App.—Corpus Christi Aug. 18, 2005, no pet.) (mem. op.), and *Gipson v. Huerta*, No. 13–02–00490–CV, 2003 WL 21666140 (Tex. App.—Corpus Christi July 17, 2003, no pet.) (mem. op.). He argues from these cases that a protective order is inappropriate in this case because of the absence of "multiple instances of past violence, threats to kill the victim, and a particularly vicious and disabling physical attack," as were found in *Banargent*. *See* 2006 WL 462268, at *2.

In *Banargent*, the court of appeals held that "[w]hile past violence does not mandate a finding of likely future violence, it can support such a finding in some instances, such as here, where there were multiple instances of past violence,

8

threats to kill the victim, and a particularly vicious and disabling physical attack." *Id.* Williams argues that this case is distinguishable from *Banargent* and analogous to *In re J.A.T.* and *Gipson*, both of which were cases in which a court of appeals overturned a protective order due to the lack of evidence supporting a likelihood of future family violence. *In re J.A.T.*, 2005 WL 1981497, at *1 (even assuming isolated incident of pulling applicant toward defendant constituted family violence, record contained no evidence regarding likelihood of future violence); *Gipson*, 2003 WL 21666140, at *2 (record contained no evidence regarding likelihood of future violence). According to Williams, these cases, taken together with *Banargent*, establish that there must be a showing of multiple instances of past violence, threats to the kill the victim, or a particularly vicious and disabling attack. We reject that analysis of the applicable law. None of the courts deciding *Banargent*, *In re J.A.T.*, or *Gipson* held that such elements are requirements for finding a likelihood of future violence based upon past violence. Instead, in appropriate cases courts have recognized that "past violent conduct can be competent evidence which is legally and factually sufficient to sustain the award of a protective order." *Boyd v. Palmore*, No. 01–10–00515–CV, 2011 WL 4500825, at *5 (Tex. App.—Houston [1st Dist.] Sept. 29, 2011, no pet.) (quoting *In re Epperson*, 213 S.W.3d 541, 544 (Tex. App.—Texarkana 2007, no pet.)); *see also Vongontard v. Tippit*, 137 S.W.3d 109, 113–14 (Tex. App.—Houston [1st Dist.]

2004, no pet.) (affirming protective order where defendant had continued to attempt contact with victim and victim believed that violence was likely to continue without entry of a protective order).

Based on the record in this case, we conclude that Bowles's testimony provided legally sufficient evidence to support the trial court's finding that future violence was likely to occur. That evidence included: (1) the attempted sexual assault and beating of Bowles on November 17; (2) the unwelcome return to her apartment the same night; and (3) the prior incident of violence when Williams pushed her and the two bit each other. Given the testimony regarding prior violence and Williams's return to Bowles's apartment in the face of a response by law enforcement, the trial judge reasonably could have found that family violence was likely to recur in the future. *See, e.g.*, *Davis v. Sampson*, No. 01–10–00604–CV, 2011 WL 6306639, at \*6 (Tex. App.—Houston [1st Dist.] Dec. 15, 2011, no pet.) (mem. op.); *Boyd*, 2011 WL 4500825, at \*5; *In re Epperson*, 213 S.W.3d at 544.

## Conclusion

We affirm the judgment of the trial court.


Michael Massengale
Justice

Panel consists of Chief Justice Radack, Justices Massengale and Huddle.

10